Filed 3/16/16  M.J. v. Superior Court CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| M.J. et al.,<br><br>    Petitioners,<br><br>    v.<br><br>THE SUPERIOR COURT OF SAN DIEGO COUNTY,<br><br>    Respondent;<br><br>SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY et al.,<br><br>    Real Parties in Interest. | D069334<br><br>(San Diego County<br>Super. Ct. No. CJ1234A-B) |

PROCEEDINGS in mandate after referral to a Welfare and Institutions Code section 366.26 hearing.[1]  Laura J. Birkmeyer, Judge.  Petitions denied.

Dependency Legal Group of San Diego and Amanda J. Gonzales for Petitioner M.J.

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

Dependency Legal Group of San Diego and John P. McCurley for Petitioner J.J.

No appearance by Respondent.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Kristen M. Ojeil, Deputy County Counsel, for Real Party in Interest San Diego County Health and Human Services Agency.

## INTRODUCTION

M.J. (Mother) and J.J. (Father) seek review of juvenile court orders setting a hearing under section 366.26 with respect to their minor sons, A.J. and Alexander J. They contend the juvenile court abused its discretion in denying Mother's motion for a new jurisdiction trial and her request to allow telephonic expert testimony at the disposition hearing.  They also argue there was no substantial evidence to support the court's denial of reunification services for Alexander.  We conclude the record discloses no abuse of discretion with respect to the new trial motion or telephonic testimony request and contains substantial evidence to support the denial of reunification services to both parents.  We deny the petitions.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

I.    *Detention*

Alexander was born in April 2013.  A.J. was born in April 2015.  The San Diego County Health and Human Services Agency (the Agency) received a referral that A.J.

---

[2]    The parents also sought a stay of the section 366.26 hearing, but failed to make the required "exceptional showing of good cause."  (Cal. Rules of Court, rule 8.452(f).)  We deny this request.

had been admitted to Naval Medical Center, San Diego (Balboa Hospital) in May 2015 with brain hemorrhages and other medical issues.  Shortly thereafter, the Agency filed juvenile dependency petitions on behalf of each child.  For A.J., the Agency filed a petition under section 300, subdivision (e), alleging he suffered "severe physical abuse" and the injuries were "inflicted by his parent(s). . . ."  The petition described A.J.'s injuries, including the brain hemorrhages, eye hemorrhages consistent with abusive head trauma, and fractures to the legs and ribs, at least some of which were healing.[3]  The Agency filed Alexander's petition under section 300, subdivision (j), on the grounds his sibling had suffered severe physical abuse and there was a substantial risk Alexander would be abused or neglected.  Alexander's petition stated A.J.'s injuries were "inflicted by the child's parent. . . ."

The Agency's detention report summarized the information it received from the hospital and Mother's statements to social workers Gabriela Perez-Ramirez and Damon Colclough, who interviewed her separately on the day after A.J. was hospitalized.  The hospital documentation described A.J.'s injuries and the impressions of Dr. Sarah Villarroel, the hospital's child abuse expert.  Dr. Villarroel indicated the "injuries [were] a result of inflicted injury" and Alexander did not inflict them.

Mother told Perez-Ramirez about the events leading to A.J.'s hospitalization. At around 4:00 a.m., Father allowed her to sleep and offered to care for A.J.  Father woke her at around 6:30 a.m. to take over care of A.J.  She tried to breastfeed A.J. at around

_____

3    This description reflects the final versions of the petitions, following certain amendments not material to the issues on appeal.

3

7:30 a.m. and noticed he did not want to feed, looked a little sleepy, and was twitchy. Mother called her mother, who advised her to see if the behavior continued. A.J. still did not want to feed. Later, she saw the left side of A.J.'s face was drooping and she brought him to the emergency room.

Colclough asked Mother about various issues, including a prior burn injury to Alexander. There had been an Agency referral in December 2014, after Alexander sustained second degree burns on 40 percent of his body; Father reported he was bathing Alexander and the water must have become hot. At the time, a doctor found the injury consistent with this explanation, but noted the injury was preventable. Mother recalled the family shared a water heater and someone had turned it up. Mother again recounted the day A.J. was hospitalized (with immaterial variations in detail) and noted Father did not express any concerns about A.J. when she took over his care. Mother also had been informed that A.J.'s injuries were from abusive head trauma, but according to Colclough, she could not provide an explanation. She told him she did not believe Father was capable of such an act. She also stated that only she and Father provided day-to-day care for A.J.

Father declined to provide a statement, on advice of counsel. The detention report also noted that during a home visit, Colclough observed a bong that smelled like marijuana.

II.    *Jurisdiction*

The Agency's jurisdiction and disposition report reflected the parents met with another social worker, Leticia Abrego, in June 2015. Mother acknowledged doctors told

4

her A.J.'s injuries were due to a stroke or abuse, but she identified Alexander as the cause. She explained the leg and foot fractures were from Alexander "pulling on [A.J.'s] feet," noting he "would yank him a few times," and that the rib fractures were from him "plopp[ing]" on A.J. during A.J.'s tummy time. She thought the brain bleeding could have occurred because one time when she was changing A.J.'s diaper, Alexander "came up to kiss him but instead he head butted him." She said the doctors did not believe these explanations. She denied shaking A.J. or swinging him around, and similarly denied he had fallen or had any accidents.

When Abrego spoke with Father, he provided similar reasons for A.J.'s injuries. He explained Alexander was "strong, and . . . would yank the baby's leg," "manage[d] to lay on [A.J.] one time when he was doing tummy time," and "sometimes will give [A.J.] a kiss and will head butt him." Father also noted Mother's family had a history of osteogenesis imperfecta (OI). He acknowledged the doctors dismissed these explanations. When Abrego asked how else A.J. could have been injured, he stated: "I probably would not believe the doctors. I don't believe a lot in medicine." He denied shaking A.J., swinging him by the legs, or doing anything that could have caused the injuries. The report also reflected Father used marijuana occasionally (but not currently) and had rubbed it on Alexander after he was burned.

The jurisdiction and disposition report also contained a statement from Dr. Mary J. Willis, who examined genetics issues. She did not find evidence of any genetic condition that could have predisposed A.J. to his injuries or caused them. She believed it was unlikely he had OI, but found obtaining additional evidence would be helpful and ordered

5

testing. She also found another condition, Marfan syndrome, unsupported by the injuries and family history.

The Agency recommended reunification services not be offered, pursuant to section 361.5, subdivision (b)(5) for A.J. and subdivision (b)(6) for Alexander. The Agency cited the seriousness of A.J.'s injuries while he was under his parents' care and their failure to provide a plausible explanation.

The juvenile court held a series of hearings during the summer of 2015, to address evidentiary and trial-setting issues. At the initial hearing in June, the parents set the matter for trial and waived time, citing the need to obtain necessary documents and medical review. The court and parties addressed various other issues, including the pending OI results. At a July settlement conference, the commissioner continued the hearing because certain information remained outstanding and set trial dates for September 1 and 2. At the continued hearing in August, the commissioner noted, among other issues, that the doctor who performed Mother's psychological evaluation (Dr. Walter O'Meara) was unavailable for trial, bifurcated disposition, and set disposition for September 28 and 30.

The Agency provided addendum reports, which confirmed A.J. was negative for OI and reflected another interview between Abrego and Mother. Abrego asked her if she suspected Father could have hurt A.J., and she responded, "Me and my husband have not hurt him." She also questioned the OI blood test (indicating a skin biopsy might be needed), maintained Alexander could be at fault and identified additional potential causes, including vitamin D deficiency in A.J., her fall down a flight of stairs while eight months

6

pregnant, her kidney infection (presumably also while pregnant), and a subdural hematoma during birth.

The jurisdiction hearing commenced on September 1, as scheduled. Dr. Villarroel testified A.J.'s injuries were intentionally inflicted, based on the injuries, lab tests, consultation with other specialists, and the parents' inability to provide an adequate explanation. Her opinion was that the injuries were due to severe physical abuse. She noted the radiologist observed A.J.'s rib fractures occurred at a different time than the head injury. She also explained Alexander could not have caused the injuries and likewise ruled out the parents' other suggested explanations. On cross-examination, Dr. Villarroel acknowledged she did not observe any bruises or lesions when A.J. was in the hospital.

On September 3, the juvenile court issued its jurisdiction ruling. The court found by clear and convincing evidence that the petition allegations were true as to each boy. With respect to A.J., the court found he suffered severe physical abuse and the parents were responsible. The court explained: "I do find in this case that the evidence was—the abuse was caused by one or both of the parents or by a person known to the parents, and I do so under these circumstances, based on my review of all of the evidence in this case. . . . Parents repeatedly instructed that they were the two caregivers for this small child. Although they now generally argue that there were relatives that came in the home at various times to assist them, I know at no point in time did they claim that anyone else abused the child, save the two-year-old." The court concluded, "the evidence points to

and supports a finding that the abuse that was suffered by the child was caused by the parent or a person known to the parent."

The juvenile court cited *In re E.H.* (2003) 108 Cal.App.4th 659 (*E.H.*) and observed that "while there is not a specific perpetrator that can be identified today, that is, the Court cannot discern based on the facts in evidence before the Court today, whether it was, indeed, specifically and on a particular date and time, mother or father, I do note that [*E.H.*] holds that the Court may still make a [section] 300 [subdivision] (e) finding based on circumstantial evidence, which this Court feels abounds in this case when the child is in the custody of a parent and there's no claim anyone else abused the child."

With respect to Alexander, the juvenile court incorporated its comments as to A.J.'s injuries and their causes. It found A.J. was Alexander's sibling, A.J. was abused or neglected as defined in section 300, subdivision (e), and there was clear and convincing evidence of a substantial risk that Alexander would be abused or neglected. The court concluded that he was a person described in section 300, subdivision (j).

III.   *Mother's Motion for New Trial*

On September 27, the day prior to the date set for disposition, Mother's counsel served a section 388 motion asking the juvenile court to revisit its jurisdictional findings. The motion contended that newly obtained opinions from Drs. Charles Hyman and David Ayoub contradicted the evidence on which the court based jurisdiction. Following discussions regarding the proper format for the request, the court permitted Mother's counsel to restyle it. Mother's counsel suggested section 385 might be appropriate. The court stated: "I do think, with respect to a motion to reconsider to reopen, there must be

8

some presentation of why that information couldn't have been presented at the original trial, the diligence, or lack thereof, that was engaged in by the attorney and the relevance or the materiality of the issue, the underlying issue."

On diligence, Mother provided a declaration detailing her efforts to obtain an expert and contended that any failure to seek a continuance did not reflect a lack of diligence, as she did not know when experts would be available or what they would say. The court denied the motion, identifying as a "very significant concern" that "there was no continuance requested . . . . [¶] [S]he didn't seek the appropriate remedy at the appropriate time, which would be to come before the court and indicate that she needed more time to locate an expert." The court found Mother's counsel had multiple opportunities to seek a continuance, but failed to do so, and concluded she did not exercise reasonable diligence.

IV.     *Mother's Request for Telephonic Evidence*

Mother identified Drs. Hyman and Ayoub as potential disposition witnesses, but due to their possible unavailability, requested the juvenile court permit telephonic testimony. County counsel and minors' counsel challenged the relevance of this evidence, and minors' counsel also opposed telephonic testimony. The court permitted Mother to submit offers of proof on these issues. The court noted at the time: "I do think, particularly in light of the fact that the court would have to make credibility findings with respect to these witnesses, . . . it would be essential to have them, specifically, in the courtroom."

9

The court subsequently issued a written ruling and permitted the experts to testify. However, it denied the request for telephonic testimony, citing Evidence Code section 711 and explaining that "[a]ll parties have the right to confront the witnesses and the court must make essential credibility findings, which cannot occur with telephonic testimony." The court later elaborated on this ruling, explaining: "[P]articularly in this circumstance, where the court has heard the live testimony of the Agency's expert, and particularly because these doctors are— apparently are going to be relying on numerous documents, and credibility is [] significant — [live testimony] is essential to the court's finding with respect to the consideration of their evidence . . . ."

V.     *Disposition*

In further addendum reports prior to disposition, Mother reiterated that she did not cause the injuries or think Father could have done so, and stated A.J. was the "calmest baby" she ever cared for. The Agency maintained its recommendation that services not be provided. It viewed services as unlikely to be beneficial, given the parents continued to believe A.J.'s injuries were caused by Alexander or other causes ruled out by the doctors.

In November 2015, the court held the disposition hearing. Dr. O'Meara testified Mother had no psychological disorders that would impede services, had the emotional ability to benefit from services, and was not delusional, but rather "sincerely believe[d]" Alexander caused A.J.'s injuries. Social worker Abrego testified services were not likely to prevent reabuse. When asked for the basis for her opinion, she explained the parents

10

lacked insight into the injuries, still lived together (reflecting they "believe[d] neither one of them did it"), and had not learned child abuse prevention. She also opined it would not be in Alexander's best interests to provide services. She noted the parents continued to blame him for A.J.'s injuries, had not taken any responsibility, and denied there was any abuse in the home.

The juvenile court incorporated its jurisdictional findings, adopted the Agency's recommendations, and denied reunification services for Alexander under section 361.5, subdivision (b)(6). The court stated with respect to the parents: "[A]s I have previously found on September 3rd, one, or the other, or both inflicted injuries on [A.J.]." The court reiterated this finding multiple times, observing that "the clear and convincing evidence points to one or both of them" and finding that "[b]oth parents . . . are responsible for the injuries." The court found by clear and convincing evidence that Alexander had been adjudicated a dependent under section 300, subdivision (j), due to the infliction of severe physical harm to his sibling, A.J. The court further found that A.J.'s injuries were serious and nonaccidental.

The court then found there was not clear and convincing evidence that it would benefit Alexander or be in his best interests to pursue reunification with Father. The court explained there must be a "truthful acknowledgment as to the cause and danger and risk to their children." Although Father participated in services, he maintained something besides force caused A.J.'s injuries. The court specifically expressed concern that the parents continued to identify Alexander as the most likely cause of A.J.'s injuries. The

11

court also noted additional issues regarding Father's "continued lack of responsible parenting," including his use of marijuana "like an ointment" on Alexander's burns.

The court similarly found no clear and convincing evidence that it was in Alexander's best interests to reunify with Mother. The court acknowledged Dr. O'Meara's testimony, but gave little weight to his conclusions regarding services, given he did not address Mother's rigidity in her beliefs and his recommendations went beyond his area of competence. In contrast, the court observed that Abrego was experienced and qualified to render her opinions. As with Father, the court noted Mother's participation in services, but found she needed to "acknowledge the true source of risk and danger to her children." The court explained, once more: "[E]ither she, or the father, the two of them acting in concert, on multiple occasions brought such force . . . upon [A.J.] that it caused his bones to be broken, and his brain to bleed, and his retina to bleed. And . . . after all of this time, Mother is still rigid and will not address that."

Mother and Father filed petitions for writ review.

DISCUSSION

I.   *Denial of New Trial Request*

The parents contend the juvenile court erred in denying Mother's motion for a new trial on jurisdiction. We review this ruling for abuse of discretion. (*In re J.C.* (2014) 226 Cal.App.4th 503, 525 (*J.C.*).) Applying this standard, we reject their argument.

Section 385 provides that "[a]ny order made by the court in the case of any person subject to its jurisdiction may at any time be changed, modified, or set aside, as the judge deems meet and proper, subject to such procedural requirements as are imposed by this

12

article." (§ 385.) The juvenile court determined, and the parties do not dispute, that the requirements of section 388 applied to Mother's motion. (See *In re Marilyn H.* (1993) 5 Cal.4th 295, 305.) Section 388 provides for modification of an order based on "grounds of change of circumstance or new evidence . . . ." (§ 388, subd. (a)(1).) The term "new evidence" is "construed to include the three requirements of new evidence, reasonable diligence, and materiality." (*In re H.S.* (2010) 188 Cal.App.4th 103, 108 (*H.S.*).)

The juvenile court determined Mother's counsel did not exercise reasonable diligence, based on her failure to request a continuance despite multiple chances to do so. It specifically observed she could have advised the court she needed more time to locate an expert. The record supports these findings and we conclude the court did not abuse its discretion in denying the new trial motion.[4]

The parents, however, maintain the ruling was in error. Mother contends she did not move for a continuance because she did not have the information necessary to do so, citing various authorities. (See § 352, subd. (a); *Renee S. v. Superior Court* (1999) 76 Cal.App.4th 187, 196 (*Renee*); *People v. Howard* (1992) 1 Cal.4th 1132, 1171 (*Howard*); *Scott v. Farrar* (1983) 139 Cal.App.3d 462, 469 (*Scott*).) None support her position.

---

4       The court also noted that, with one potential exception, there was nothing to suggest the evidence was new. (See *H.S.*, *supra*, 188 Cal.App.4th at p. 108 ["[A]ppellant's . . . motion relied on the new expert's opinion that is based on old evidence available at the time of trial . . . . The fact that the new expert interprets the evidence differently than did the medical doctors who testified at the jurisdiction hearing . . . does not make his expert opinion 'new evidence' . . . ."].)

13

Section 352 simply provides that "[c]ontinuances shall be granted only upon a showing of good cause and only for that period of time shown to be necessary," and the cited portion of *Renee* reiterates the time requirement. (*Id.*, subd. (a); *Renee*, *supra*, 76 Cal.App.4th at p. 196.) *Howard* requires a party seeking a continuance to establish the materiality and need for the evidence and that it can be obtained in a reasonable time, among other things. (*Howard*, *supra*, 1 Cal.4th at p. 1171.) Mother cannot plausibly claim she lacked sufficient information to meet these requirements. Based on the opinions she obtained, one can reasonably infer she was seeking an expert to opine that A.J.'s injuries did result, or could have resulted, from something other than nonaccidental force. At minimum, she knew the general substance and potential importance of the opinions she was seeking, if not the time they would be available. She could have requested at least some additional time to conclude her search.

*Scott* likewise does not support Mother's position. Although *Scott* does provide reasonable diligence does not require a request for continuance if the party is "unaware of either the nature or materiality" of the testimony (*Scott*, *supra*, 139 Cal.App.3d at p. 469), Mother was fully aware of the type of opinion she was seeking and its significance. In addition, *Scott* focused on standards applicable to summary judgment, explaining that "[t]he same degree of diligence in discovery that is required in preparation for trial is not required of a party who opposes a summary judgment motion relatively early in the litigation." (*Id.* at p. 468.) Even assuming *Scott* were applicable in the juvenile context (and Mother cites no authority to suggest it is), the parties *were* at the trial stage here.

14

Mother also suggests that not seeking a continuance "was in line with adhering to the strict timelines" of dependency cases, particularly given the prior continuances here. This explanation is unpersuasive. If anything, the other continuances should have suggested the juvenile court was amenable to such relief. Moreover, she does not explain why those same timelines did not dissuade her from seeking a new jurisdictional trial. Finally, Mother contends her decision was not a strategic one. However, the issue here is diligence, not motive.

Turning to Father's arguments, he contends the expert testimony was material to jurisdiction. However, materiality is not at issue here, either. The juvenile court denied the motion on diligence grounds, and as discussed *ante*, this was not an abuse of discretion. Father also argues due process "require[s] a remedy by which a defendant can bring newly discovered evidence before a court to urge correction of an erroneous judgment," quoting *People v. Martinez* (1984) 36 Cal.3d 816, 826. The parents did not lack a remedy. Mother could have requested a continuance of the jurisdiction hearing, but did not. The juvenile court then permitted Mother's counsel to move for a new trial and attempt to establish her diligence, but she failed to make this showing. Father has not demonstrated any lack of due process. (See *In re Nada R.* (2001) 89 Cal.App.4th 1166, 1176 (*Nada R.*) ["[T]he United States Constitution guarantees 'a meaningful opportunity to present a complete defense.' (Citation.) [I]n dependency proceedings, a parent's right to due process is limited by the need to balance the 'interest in regaining custody of the minors against the state's desire to conclude dependency matters expeditiously and . . . exercise broad control over the proceedings. . . .' (Citation.)"].)

Finally, both parents rely on *People v. Watson* (1956) 46 Cal.2d 818, 821 (*Watson*) to argue the ruling prejudiced them and it was probable the court would have ruled differently on jurisdiction (i.e., that the error led to a miscarriage of justice). However, *Watson* addressed the impact of certain contentions of error. (*Id.* at p. 839; see *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1668 [referencing the "harmless error test enunciated in (*Watson*)"].) Here, the juvenile court did not err, so we need not assess whether the alleged error was prejudicial or led to a miscarriage of justice.

II.     *Denial of Telephonic Testimony Request*

The parents contend the juvenile court erred by declining Mother's request for Drs. Hyman and Ayoub to testify telephonically. A juvenile court's refusal to allow telephonic testimony is reviewed for abuse of discretion. (*Nada R.*, *supra*, 89 Cal.App.4th at p. 1176.) The record reflects no such abuse.

The juvenile court based its ruling on Evidence Code section 711 and the court's need to make essential credibility findings. Evidence Code section 711 provides that "[a]t the trial of an action, a witness can be heard only in the presence and subject to the examination of all the parties to the action, if they choose to attend and examine." A court may evaluate witness credibility by, among other methods, considering the witness's "demeanor while testifying and the manner in which he [or she] testifies." (Evid. Code, § 780, subd. (a).) The probative value of witness demeanor is well settled. (See *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1358 ["Oral testimony of witnesses given in the presence of the trier of fact is valued for its probative worth on the issue of credibility, because such testimony affords the trier of fact an opportunity to

16

observe the demeanor of witnesses.  (Citations.)  A witness's demeanor is ' "part of the evidence" ' and is 'of considerable legal consequence.' "]; *Denny H. v. Superior Cour*t (2005) 131 Cal.App.4th 1501, 1513–1514 ["In a contested hearing, the precise words and demeanor of a witness . . . bears on the credibility and weight the trier of fact accords the witness's testimony."].)

*Nada R.* is instructive.  There, the juvenile court expressed concerns about the reliability of telephonic testimony and allowed the father's witnesses in Saudi Arabia to testify, but not by telephone.  (*Nada R.*, *supra*, 89 Cal.App.4th at p. 1176.)  The Court of Appeal found the court did not abuse its discretion, because the father "was not prevented from offering the testimony, but only restricted in the manner of its presentation."  (*Ibid.*)  Similarly, the juvenile court here did not prevent the doctors from testifying, but simply required them to do so in person (and for legitimate reasons).  This ruling does not reflect any abuse of the juvenile court's discretion.

The parents' arguments to the contrary are unpersuasive.

First, Mother suggests telephonic expert testimony can only be denied when "the proposed expert is out of the country, the other parties do not have notice of the proposed testimony, and a continuance would be required for the other parties to rebut the evidence," citing *Nada R.*, *supra*, 89 Cal.App.4th at page 1177.  However, this portion of *Nada R.* addressed the exclusion of an expert's testimony pursuant to Evidence Code section 352 (under which a court can exclude evidence that is more time consuming than it is probative), not telephonic testimony.  The juvenile court did not exclude the doctors' testimony, so both this portion of *Nada R.* and Evidence Code section 352 are inapposite.

17

Second, Mother contends cross-examination could occur by telephone.  However, the Evidence Code contemplates witnesses will be heard and examined "in the presence" of the parties.  (Evid. Code, § 711.)  Although juvenile courts have the discretion to permit testimony by telephone, including cross-examination, the court here reasonably determined live testimony was necessary under the circumstances.

Third, Mother challenges the significance of witness demeanor.  To start, she contends a court also may consider the other factors in Evidence Code section 780, but does not explain why use of those factors would diminish the importance of demeanor.  She next acknowledges *Elkins's* statement regarding the probative value of witness demeanor, but implies demeanor is less relevant with respect to expert witnesses.  However, she cites no authority to support this argument.  She also claims the juvenile court "had the option of Skype testimony," but does not indicate whether she presented this alternative to the court.  We will not address a theory for the first time on appeal.  (See *In re Dakota H.* (2005) 132 Cal.App.4th 212, 222.)

Fourth, Mother contends the court's ruling was a "denial of [her] due process right to a meaningful opportunity to present a complete defense and was not harmless beyond a reasonable doubt," citing a criminal case, *Chapman v. California* (1967) 386 U.S. 18, 24.  Even assuming criminal due process concerns apply in dependency proceedings, we see no due process issue here:  the juvenile court balanced Mother's interest in having her

18

experts testify with the need here for in-person testimony. (See *Nada R.*, *supra*, 89 Cal.App.4th at p. 1176.) In turn, there is no need to engage in harmless error analysis.[5]

Finally, both parents argue they were prejudiced by the court's ruling, contending the evidence would have permitted them to establish entitlement to reunification services. Father also contends the evidence could have prevented removal. But, again, the evidence was not excluded; the witnesses simply had to testify in person, and did not do so. In addition, the argument is entirely speculative. For one thing, the parents assume the juvenile court would have credited Mother's experts over those of the Agency. More importantly, they offer no authority to suggest a juvenile court could, or would, reach dispositional findings contrary to its jurisdictional findings (much less that it could then rely solely on the latter findings for its removal and services rulings).

III.    *Denial of Reunification Services*

The parents contend substantial evidence does not support denial of services to Alexander.[6]

A.    *Governing Law*

"Unless a specific statutory exception applies, the juvenile court must provide services designed to reunify the family within the statutory time period. [Citations.] The

---

[5]    Mother also notes the juvenile court denied her request during the disposition hearing to continue the matter so her experts could testify, but offers no argument that this ruling was erroneous. Although the Agency addresses the ruling, to the extent Mother intended to raise the issue, she has forfeited it. (See *In re Sade C.* (1996) 13 Cal.4th 952, 994 (*Sade*); *People v. Stanley* (1995) 10 Cal.4th 764, 793 (*Stanley*).)

[6]    The parents do not contest the denial of reunification services for A.J.

19

statutory exceptions to providing reunification services under section 361.5 have been referred to as reunification 'bypass' provisions. [Citations.] There is no general bypass provision; the court must find by clear and convincing evidence that one or more of the subparts enumerated in section 361.5, subdivision (b) apply before it may deny reunification services to a parent." (*Tyrone W. v. Superior Court* (2007) 151 Cal.App.4th 839, 845-846 (*Tyrone*).)

The juvenile court relied on section 361.5, subdivision (b)(6) to deny reunification services for Alexander. A court may deny services under subdivision (b)(6) when the "child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of . . . the infliction of severe physical harm to the child, [or] a sibling . . . by a parent or guardian . . . and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent or guardian." (*Ibid.*) Infliction of severe physical harm includes, but is not limited to, "deliberate and serious injury inflicted to or on a child's body or the body of a sibling . . . by an act or omission of the parent or guardian, or of another individual . . . with the consent of the parent or guardian. . . ." (*Ibid.*) In determining whether services will benefit the child, the court must consider any information it deems relevant, including the specific act or omission comprising the severe physical harm, the circumstances under which the harm was inflicted, any history of abuse of other children, and the likelihood the child could be safely returned to the parent's care without continuing supervision. (*Id.*, subd. (i).)

When the juvenile court denies services under subdivision (b)(6), it must "read into the record the basis for a finding of . . . the infliction of severe physical

20

harm . . . and . . . specify the factual findings used to determine that the provision of reunification services to the offending parent or guardian would not benefit the child." (§ 361.5, subd. (k).) In addition, the court cannot order services unless it finds "by clear and convincing evidence, that reunification is in the best interest of the child." (*Id.*, subd. (c).)

We review an order denying reunification services for substantial evidence. (*Tyrone*, *supra*, 151 Cal.App.4th at pp. 854-855.)

B.      *Analysis*

Substantial evidence supports the denial of reunification services for Alexander. The parents offer no substantive challenge to most aspects of the juvenile court's ruling, including its findings that Alexander was adjudicated a dependent under section 300, subdivision (j), due to the infliction of severe physical harm to A.J., reunification services would not benefit Alexander, and there was no clear and convincing evidence that reunification services were in his best interests. (§ 361.5, subds. (b), (c), (k).) We could view these issues as conceded. (See *Sade*, *supra*, 13 Cal.4th at p. 994; *Stanley, supra,* 10 Cal.4th at p. 793.) In any event, based on the evidence set forth *ante*, we conclude substantial evidence supports these elements of the court's ruling.

The parents do contest the juvenile court's determination that their acts or omissions caused A.J.'s injuries, but substantial evidence likewise supports it. The court found at jurisdiction that A.J.'s injuries were "caused by one or both of the parents or by a person known to the parents," noting specifically they were A.J.'s caregivers and "at no point in time" claimed that anyone else abused him (besides Alexander). The parents do

21

not contend there is an absence of substantial evidence to support this finding and it therefore has preclusive effect. (See *E.H.*, *supra*, 108 Cal.App.4th at p. 669 [substantial evidence review applies to jurisdictional findings]; *Tyrone*, *supra*, 151 Cal.App.4th at p. 854 [discussing "preclusive effect" of the juvenile court's jurisdictional findings].) In turn, the finding was sufficient to establish their acts or omissions caused A.J.'s injuries, for purposes of section 361.5, subdivision (b)(6).

*Tyrone* is instructive. There, a minor's sibling died under suspicious circumstances. (*Tyrone*, *supra*, 151 Cal.App.4th at p. 844.) The minor's petition identified the sibling's injuries, including rib fractures, as "inflicted non-accidentally by the child's parents." (*Id.* at p. 854.) The juvenile court made its jurisdictional findings by clear and convincing evidence, the standard of proof under section 361.5, subdivision (b)(6). (*Tyrone*, at p. 854.) The court then denied services under subdivision (b)(6), the father filed a writ petition, and this court affirmed. (*Tyrone*, at pp. 845, 854.) The father argued subdivision (b)(6) "require[d] the court to identify the parent" who harmed the sibling and the evidence did not support a finding he did so. (*Tyrone*, at p. 848.) He did not challenge the jurisdictional findings. (*Id.* at p. 854.) After noting their preclusive effect, we explained the court had "identified 'the parents' as the persons responsible for the deliberate acts that caused [the sibling's] rib fractures" and the record "clearly show[ed]" the court did not base its findings on negligence. (*Ibid.*) We concluded this "finding that the parents . . . inflicted non-accidental and severe physical abuse on their infant daughter [was] sufficient to identify the offending parent within the meaning of section 361.5, subdivision (b)(6)." (*Ibid.*) The situation here is analogous. A.J.'s petition

stated his injuries were "inflicted by his parent(s). . . ." The juvenile court made its jurisdictional findings by clear and convincing evidence and specifically identified the parents (Mother, Father, or both) as being responsible for A.J.'s injuries. And, significantly, the parents do not challenge that jurisdictional finding.

Both parents attempt to distinguish *Tyrone*. Mother also contends the court improperly denied her services because she failed to blame Father for A.J.'s injuries. We address the arguments in turn.

First, Mother contends the evidence was insufficient to establish she "was complicit in [A.J.'s] being abused." Father makes similar arguments, on his own behalf. However, as discussed *ante*, the juvenile court's jurisdictional finding that both parents were responsible for A.J.'s injuries was sufficient for purposes of section 361.5, subdivision (b)(6). In addition, the court reiterated this finding multiple times at the disposition hearing, leaving no doubt it found "both parents . . . responsible for the injuries." Substantial evidence supports this finding, including, without limitation, Mother's acknowledgment that only she and Father provided day-to-day care for A.J. and the parents' inability to identify anyone else (besides Alexander) who could have caused the injuries.

Second, Mother acknowledges *Tyrone* permits denial of reunification services when the court identifies both parents as the perpetrators, but contends the juvenile court here did not identify a specific perpetrator, citing Alexander's petition (which used the word "parent," instead of "parents") and the court's purported inability to specify whether the perpetrator was Mother, Father, or both. However, the use of "parent" in Alexander's

23

petition appears to be a clerical error; the boys' petitions were both based on A.J.'s injuries, and A.J.'s petition does identify the "parent(s)." Further, *Tyrone* makes clear that the specific perpetrator can be both parents, when they have both been found responsible—as is the case here. (*Tyrone*, *supra*, 151 Cal.App.4th at p. 854.)[7]

Third, Mother suggests the juvenile court improperly applied a negligence standard, as evidenced by its statement that the parents "knew or reasonably should have known" that A.J. was being abused. Although the juvenile court did use this phrase once, at the disposition hearing, we find it harmless in light of the court's clear and repeated finding that the parents were responsible for the abuse to A.J. The record does not reflect this finding was based in negligence. (See *Tyrone*, *supra*, 151 Cal.App.4th at p. 854.)

Fourth, Father argues that in the absence of a specific perpetrator, the juvenile court was required to find by clear and convincing evidence that Father knew A.J. was being abused, citing *Tyrone*, *supra*, 151 Cal.App.4th at page 843. He also notes the evidence did not reflect A.J.'s injuries were obvious, such that knowledge could be inferred. However, the cited portion of *Tyrone* actually provides that identification of a perpetrator is necessary when the evidence does not show both parents knew the child was being injured. (See *ibid*.) Here, the juvenile court did identify both parents as being responsible for A.J.'s injuries, so we need not address the issue of knowledge.

---

7       Mother also contends circumstantial evidence is insufficient when denying reunification services, presumably referring to the juvenile court's jurisdictional findings. However, she cites no authority to support this point and also ignores the preclusive effect of the parents' failure to challenge those findings. (*Stanley*, *supra*, 10 Cal.4th at p. 793; *Tyrone*, *supra*, 151 Cal.App.4th at p. 843.)

24

Finally, Mother claims the juvenile court erred by purportedly basing its denial of reunification services with Alexander on the fact that she "had not blamed Father" and that a perpetrator "had not admitted guilt." We note the findings she cites relate primarily to A.J. and do not reflect the court stated she had to "blame Father," but we will address the premise of her argument. Relying on *L.Z. v. Superior Court* (2010) 188 Cal.App.4th 1285, she contends a court need not identify a perpetrator to rule on reunification services. We agree, but *L.Z.* is distinguishable. There, the juvenile court "[t]wice . . . remarked that services would not be provided unless and until the perpetrator of the physical abuse came forward" and denied services when neither parent would admit the abuse. (*Id.* at p. 1293.) Here, in contrast, the court focused on Mother's attitude toward causation for permissible reasons. Specifically, the court was concerned she remained in denial about the source of A.J.'s injuries and continued to give explanations not supported by the medical evidence, issues relevant to whether reunification services would be beneficial and in the boys' best interests.

DISPOSITION

The petitions are denied.

McCONNELL, P. J.

WE CONCUR:

NARES, J.

McDONALD, J.